IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BENCHMARK 2020-B17, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2020-B17,** | : : : : : : : : : : : : : : : : :: : : | **CIVIL ACTION** **NO. 23-cv-1211** |
| **Plaintiff,** | | |
| v. | | |
| **25 JAY STREET, LLC, and JOSEPH TORRES,** | | |
| **Defendants.** | | |

**COMPLAINT**

Plaintiff, Wells Fargo Bank, National Association, as Trustee for the benefit of the registered holders of Benchmark 2020-B17, Commercial Mortgage Pass-Through Certificates, Series 2020-B17 ("<u>Lender</u>"), acting by and through its special servicer, Midland Loan Services, a division of PNC Bank, National Association ("<u>Midland</u>"), for its Complaint against defendants, 25 Jay Street, LLC ("<u>Borrower</u>"), and Joseph Torres ("<u>Guarantor</u>"), avers as follows:

**I.    PARTIES, JURISDICTION, AND VENUE**

1. Wells Fargo Bank, National Association, is a national banking association with its main office, as designated in its Articles of Association, located in Sioux Falls, South Dakota. Non-party Midland is the special servicer for Lender with respect to the Loan (as defined below).

2.  Borrower is a New York limited liability company with its principal place of business at 77 Box Street, Brooklyn, New York 11222.  Upon information and belief, Borrower's sole member is Guarantor, who is a citizen of the State of New York.

3.  Guarantor is an individual and a citizen of the State of New York with an address of 77 Box Street, Brooklyn, New York 11222.  Guarantor is named as a defendant herein to preserve Lender's potential deficiency claim on the Guaranty (as defined below).

4.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter is controversy exceeds $75,000 and the action is between citizens of different states.

5.  Venue exists in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because the real property that is the subject of this action is situated in this district.

## II.  FACTS

### A.  The Original Loan Transaction

6.  On or about January 29, 2020, Citi Real Estate Funding Inc. ("Original Lender") made to Borrower a commercial mortgage loan in the principal amount of $18,500,000.00 (the "Loan").

7.  The Loan is evidenced by a Consolidated, Amended and Restated Promissory Note in the principal amount of $18,500,000.00 dated January 29, 2020, executed by Borrower in favor of Original Lender (the "Note"), a copy of which is attached hereto as *Exhibit A*, which consolidated certain pre-existing promissory notes executed by Borrower.

8.  To secure repayment on the Note, Borrower executed in favor of Original Lender a Consolidated, Amended and Restated Mortgage and Security Agreement dated as of January 29, 2020 (the "Mortgage"), which consolidated certain pre-existing mortgages with respect to real and other property located at 25 Jay Street in Brooklyn, New York.  A copy of the Mortgage is attached hereto as *Exhibit B*.  The Mortgage was recorded with the Office of the City

Register of the City of New York (the "Recorder") on February 7, 2020, as CRFN 2020000051005.

9. The Loan is also evidenced by a Loan Agreement between Borrower and Original Lender dated as of January 29, 2020 (the "Loan Agreement"), a copy of which is attached hereto as *Exhibit C*.

10. In consideration for the Loan, Guarantor executed in favor of Original Lender a Limited Recourse Guaranty dated January 29, 2020 (the "Guaranty"), a copy of which is attached hereto as *Exhibit D*. The Note, the Mortgage, the Loan Agreement, the Guaranty and various other documents executed by Borrower and/or Guarantor in favor of Original Lender with respect to the Loan are collectively referred to herein as the "Loan Documents."

11. Pursuant to the Mortgage, Borrower granted to Original Lender a security interest in, *inter alia*, certain Personal Property (the "Personal Property") as more fully described in Section 1.1(e) of the Mortgage, which is incorporated herein by reference.

12. Original Lender perfected its lien and security interest in the Personal Property via a UCC-1 Financing Statement, a copy of which is attached hereto as *Exhibit E*, which was filed with the New York Department of State (the "Department") on February 12, 2020, as Filing No. 202002120097551.

B. The Assignment of the Loan to Lender

13. The Loan was subsequently securitized and was assigned by Original Lender to Lender.

14. In connection with its assignment of the Loan, Original Lender physically delivered the original Note to Lender and also executed for the benefit of Lender an Allonge to the Note, a copy of which is attached hereto as *Exhibit F*.

15.	Also in connection with its assignment of the Loan, Original Lender executed in favor of Lender an Assignment of Mortgage, a copy of which is attached hereto as *Exhibit G*, which was recorded with the Recorder on June 23, 2020, as CRFN 2020000179893.

16.	Additionally, Original Lender executed in favor of Lender a General Assignment effective March 24, 2020, a copy of which is attached hereto as *Exhibit H*, by which Original Lender assigned to Lender, *inter alia*, "all right, title and interest of Assignor in ant to the Loan . . . and all other agreements, including but not limited to guaranty agreements, and certificates and documents entered into or delivered in connection with the Loan."

17.	Original Lender also assigned its interest in the Personal Property to Lender via a UCC-3 Amendment, a copy of which is attached hereto as *Exhibit I*, which was filed with the Department on June 23, 2020, as Filing No. 202006238266218,

C.	**Relevant Contractual Provisions**

18.	The Mortgage secures, *inter alia*, Borrower's payment of the Debt (as defined) and performance of all of its other obligations under the Note, the Mortgage, the Loan Agreement and the other Loan Documents. (*See* Mortgage at pp.1-2.)

19.	Borrower is the owner of the real property located at 25 Jay Street in Brooklyn, New York, as more fully described in Exhibit A to the Mortgage (the "Land"), together with the Improvements thereon as defined in the Mortgage, which is operated as a multifamily property.

20.	The Mortgage creates a security interest in all of Borrower's property, rights, interest and estates in and to the Land and the Improvements, together with the Personal Property and all other property owned by Borrower and collectively defined in the Mortgage as the "Property." (Mortgage § 1.1.)

21. The Loan Agreement has required at all relevant times that "Borrower shall make a payment to Lender of interest and, to the extent applicable, principal in the amount of the Monthly Debt Service Payment Amount on the First Monthly Payment Date and on each Monthly Payment Date occurring thereafter to and including the Maturity Date." (Loan Agreement § 2.6(a).)

22. The Loan Agreement also requires that on each Monthly Payment Date, Borrower shall make deposits into various reserve accounts for the Loan (the "Accounts"). (Loan Agreement, Art. 8.)

23. The Loan Agreement provides that, if any sum due under the Loan Documents is not paid by Borrower on the date on which it is due, "Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment." (Loan Agreement § 2.6(d).)

24. The Loan Agreement further provides that it shall constitute an Event of Default if, *inter alia*, "any Monthly Debt Service payment . . . is not paid when due" or "any deposit to any of the Accounts required hereunder . . . is not paid when due." (Loan Agreement §§ 10.1(a)(A)-(B).)

25. The Loan Agreement also provides that, "[i]n the event that, and for so long as, any Event of Default shall have occurred and be continuing, . . . the then outstanding principal balance of the Loan . . . shall accrue interest at the Default Rate," which is defined as "a rate per annum equal to the lesser of (i) the Maximum Legal Rate, or (b) five percent (5%) above the Interest Rate [of 3.95% per annum]." (Loan Agreement § 2.5(c) & at pp. 6, 11.)

5

26. Additionally, the Loan Agreement provides that, "[a]fter the occurrence and during the continuance of an Event of Default and notwithstanding any acceleration of the Debt in accordance with the applicable terms and conditions hereof, the Default Yield Maintenance Premium [as defined] shall, in all cases, be deemed a portion of the Debt due and owing hereunder and under the other Loan Documents." (Loan Agreement § 2.7(c).)

27. The Mortgage provides that, "[u]pon the occurrence and during the continuance of any Event of Default," Lender may "declare the entire unpaid Debt to be immediately due and payable." (Mortgage § 8.1(a); *accord* Note Art. 2.)

28. The Mortgage also provides that, "[u]pon the occurrence and during the continuance of any Event of Default," Lender may "institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law." (Mortgage § 8.1(b).)

29. The Loan Agreement provides that Borrower agrees to pay or reimburse Lender for "Lender's reasonable costs and expenses (including reasonable, actual attorneys' fees and disbursements) . . . incurred by Lender in accordance with this Agreement in connection with," *inter alia*, "servicing the Loan (including, without limitation, enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the [Mortgage], the Note and the other Loan Documents or with respect to the Property)," including "any related special servicing fees, liquidation fees, modification fees, work-out fees and other similar costs or expenses payable to any Servicer, trustee and/or special servicer of the Loan (or any portion thereof and/or interest therein)." (Loan Agreement § 17.6.)

30. Additionally, the Loan Agreement provides that, in the event that "the [Mortgage] is foreclosed in whole or in part" or "Lender exercises any of its other remedies under

6

this Agreement, the [Mortgage], the Note and the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lender . . . in connection therewith." (Loan Agreement § 17.7.)

### C.  Borrower's Defaults on its Obligations

#### 1.  The Payment Default

31.  Beginning no later than the Monthly Payment Date for June 2021, and as early as the monthly Payment Date for April 2020, Borrower failed on multiple occasions to pay the Monthly Debt Service Payment Amounts or to make the required deposits into the Accounts when due under the Loan Documents.

32.  Borrower's failure to make the required monthly payments when due constitutes an Event of Default under the Loan Documents (the "<u>Payment Default</u>"). (*See* Loan Agreement §§ 10.1(a)(A)-(B).)

33.  Although Borrower subsequently and belatedly made payments to Lender in the amount of its missed payments, Borrower has never paid the late charges or interest at the Default Rate resulting from the Payment Default.

#### 2.  The Cash Management Default

34.  Pursuant to Article 9 (Cash Management) of the Loan Agreement:

> Borrower shall, simultaneously herewith, establish an Eligible Account (the "**Restricted Account**") pursuant to the Restricted Account Agreement in the name of Borrower for the sole and exclusive benefit of Lender into which Borrower shall deposit, or cause to be deposited, all revenue generated by the Property. Pursuant to the Restricted Account Agreement, funds on deposit in the Restricted Account shall be transferred on each Business Day to or at the direction of Borrower unless a Trigger Period exists, in which case such finds shall be transferred on each Business Day to the Cash Management Account.

(Loan Agreement § 9.1(a).)

35. The Loan Agreement defines "Specified Tenant" to be Brooklyn Roasting Works and provides that a "Specified Tenant Trigger Period" shall commence upon, among other events, "any bankruptcy or similar insolvency of Specified Tenant."  (Loan Agreement at pp. 22-24.)

36. The occurrence of a Specified Tenant Trigger Period causes the commencement of a "Trigger Period" for cash management purposes, during which Borrower is required to "deposit, or cause to be deposited, all revenue generated by the Property" into the Restricted Account, which is also called the "DACA Account."  (Loan Agreement, Art. 9.)

37. On October 21, 2020, Specified Tenant filed a voluntary petition for relief under subchapter v of chapter 11 of the Bankruptcy Code in the Eastern District of New York (the "Specified Tenant Bankruptcy").  The filing of the Specified Tenant Bankruptcy triggered Borrower's obligation to deposit into the DACA Account all revenue generated by the Property, including but not limited to $200,000.00 paid by and/or on behalf of Specified Tenant to Borrower on or about March 31, 2021.

38. Borrower failed to deposit into the DACA Account the $200,000.00 paid by and/or on behalf of Specified Tenant.

39. By letter dated April 6, 2021, a copy of which is attached hereto as ***Exhibit J***, Midland notified Borrower that "Borrower is not complying with the cash management provisions of the Loan Documents" and that "Borrower is required to immediately comply with the cash management requirements of the Loan Documents and ensure that all Rents and other income are properly deposited into the DACA Account on a timely basis."

40. The Loan Agreement provides that it shall constitute an Event of Default if, *inter alia*, among other things, "any default or breach of any term, covenant or condition of this

8

Agreement not specified in subsections (a) through (p)" of Section 10.1 (Event of Default) "is not cured . . . for thirty (30) days after notice from Lender" in the case of a non-monetary default. (Loan Agreement § 10.1(q).)

41. To date, despite Midland's notice, Borrower has failed to comply in full with its cash management obligations, including but not limited to failing and/or refusing to deposit the payments received in the Specified Tenant Bankruptcy.

42. Borrower's failure to comply with its cash management obligations after and notwithstanding Midland's notice constitutes an Event of Default under the Loan Documents (the "Cash Management Default"). (*See* Loan Agreement §§ 10.1(q).)

### 3. The Additional Defaults

43. In addition to the Payment Default and the Cash Management Default, Borrower has defaulted and/or remains in default of various other obligations under the Loan Documents (collectively, the "Additional Defaults").

44. The Additional Defaults have included but are not limited to: (i) Borrower's failure to comply with its financial reporting obligations under Section 4.12 of the Loan Agreement; (ii) Borrower's failure to obtain the Governmental Approvals evidencing the lawful use and occupancy of the Property required by Section 4.24 of the Loan Agreement; and (iii) Borrower's granting a security interest in the Property to the U.S. Small Business Administration to secure Indebtedness other than the Debt in violation of Section 5.1(a)(vii) of the Loan Agreement.

### 4. Lender's Notices of Default and Acceleration

45. Lender, through Midland, provided multiple Notices of Default to Borrower for the Payment Default and/or the Cash Management Default beginning on May 1, 2020.

46. Thereafter, Lender, through its counsel, provided a Notice of Default to Borrower by letter dated November 19, 2021 (the "November 2021 Notice of Default"), a copy of which is attached hereto as *Exhibit K*, which advised Borrower that it was in default under the Loan Documents by virtue of the Payment Default, the Cash Management Default and one or more Additional Defaults.

47. The November 2021 Notice of Default further advised Borrower that, absent a cure of the defaults as noticed within seven days, "Lender may exercise such rights, including but not limited to its remedies under the Loan Documents, as Lender in its discretion may deem appropriate." (November 2021 Notice of Default at pp. 2 and 4.)

48. Notwithstanding the November 2021 Notice of Default, Borrower failed to cure the ongoing Events of Default.

49. Lender, through its counsel, provided a Notice of Continuing Default, Acceleration and Reservation of Rights to Borrower on December 28, 2022 (the "Notice of Acceleration"),[1] a copy of which is attached hereto as *Exhibit L*, which advised Borrower that:

> AS A RESULT OF THE OCCURRENCE AND CONTINUANCE OF THE AFOREMENTIONED EVENTS OF DEFAULT, (A) THE DEBT SECURED BY THE MORTGAGE IS HEREBY ACCELERATED AND DECLARED TO BE IMMEDIATELY DUE AND PAYABLE, (B) DEMAND IS HEREBY MADE OF BORROWER FOR THE IMMEDIATE AND FULL PAYMENT OF THE DEBT, AND (C) INTEREST WILL CONTINUE TO ACCRUE AT THE DEFAULT RATE UNTIL THE DEBT IS PAID IN FULL.

(Notice of Acceleration at p. 2.)

50. To date, Borrower has failed to pay the Debt in full or otherwise cure the ongoing Event of Default.

---

[1] The Notice of Acceleration is misdated December 28, 2021, but was issued and delivered on December 28, 2022.

51. Accordingly, Lender brings this action to foreclose the Mortgage under the Loan Documents and New York law.

**D.      Lender's Damages**

52. As of January 4, 2023, there was due and owing on the Loan without defense, deduction, offset, recoupment or counterclaim the total amount of $21,300,419.83, itemized as follows:

| | |
|---|---|
| Principal Balance | $18,500,000.00 |
| Interest | 243,583.32 |
| Default Interest | 1,716,727.09 |
| Interest on Advances | 130.67 |
| Late Charges | 105,065.55 |
| Prepayment Premium | 555,000.00 |
| Reconveyance/Payoff Fee | 1,500.00 |
| Protective Advance-Legal | 9,443.60 |
| Bank Account Maintenance Fee | 1,600.00 |
| Cash Management Maintenance Fee | 1,400.00 |
| Legal Advance | 50,000.00 |
| Special Servicing Fee | 68,246.00 |
| Liquidation Fee | 212,526.96 |
| *(Less Credit – Unapplied Funds* | *164,803.36)* |
| TOTAL AMOUNT DUE a/o 1/4/2023 | $21,300,419.83 |

53. Additional interest and default interest in the total amount of $5,066.49 per diem, together with other fees, charges and costs recoverable under the Loan Documents, have accrued and continue to accrue on the Loan since January 4, 2023.

11

**COUNT ONE – MORTGAGE FORECLOSURE**

54. Paragraphs 1 through 53 of this Complaint are incorporated herein by reference.

55. Borrower executed the Note, which is secured by the Mortgage, in favor of Lender.

56. Borrower has defaulted on its obligations under the Note, the Mortgage, the Loan Agreement and the other Loan Documents.

57. Lender is authorized by the Mortgage and by New York law to foreclose the Mortgage in the event of a default by Borrower.

58. There is currently due and owing on the Loan the sum of $21,300,419.83 , together with accrued and accruing interest, default interest, fees, charges, and costs recoverable under the Loan Documents.

59. No other action has been brought to recover any part of the mortgage debt.

WHEREFORE, Lender respectfully requests that the Court enter judgment in its favor and against Borrower on Count One of the Complaint and that:

(a) Borrower, and every person or entity whose right, title, conveyance or encumbrance is recorded subsequent to the commencement of this action and the filing of a notice of pendency thereof, be barred and forever foreclosed of and from all estate, right, title, interest, claim, lien and equity of redemption of, in and to the Property, including the fixtures and articles of personality upon which the Mortgage is a lien;

(b) The Property as defined in the Complaint be decreed to be sold, according to New York law, and that the moneys arising from such sale be collected and applied to discharge the mortgage debt, to wit, Lender be paid the amount of $21,300,419.83, together with additional accrued and accruing interest at the default rate

in the total amount of $5,066.49 per diem plus additional fees, charges, and costs recoverable under the Loan Documents from January 4, 2023, so far as the amount of such monies properly applicable thereto will pay the same;

      (c)     Lender be authorized, as provided by New York law, to foreclose its security interest in the Personal Property of Borrower as defined in the Complaint, and that said Personal Property be sold together with the Land and the Improvements; and that the Property be decreed to be sold, according to law, and that the monies arising from such sale be brought into Court;

      (d)     Upon Lender's application, this Court forthwith appoint a receiver of the rents and profits of the Premises during the pendency of this action with the usual powers and duties of such receivers in commercial foreclosure actions;

      (e)     Lender be granted leave of this Court to record its judgment in the records of the Kings County Clerk and request assistance from the New York State Supreme Court as is necessary and customary to proceed with a foreclosure sale in accordance with New York law and rules, including a request for an order directing the appointment of a referee and the terms of sale of the Property and Personal Property; and

    (f)  Lender be awarded such other and further relief as the Court in its discretion may deem just and proper.

Dated:  February 14, 2023

            */s/ Raymond A. Quaglia*
            Raymond A. Quaglia (NY ID 5814264)
            Jacquelyn N. Schell (NY ID 5281837)
            BALLARD SPAHR LLP
            1675 Broadway, 19th Floor
            New York, NY  10019-5820
            (646) 346-8048
            quaglia@ballardspahr.com
            schellj@ballardspahr.com

            Counsel for Plaintiff